STATE of Missouri, Respondent,

v.

Richard Charles CONTI, Appellant.

No. KCD 29485.

Missouri Court of Appeals,
Kansas City District.

Oct. 30, 1978.

C. B. Fitzgerald, Warrensburg, for appellant.

John D. Ashcroft, Atty. Gen., Carson W. Elliff, Asst. Atty. Gen., Jefferson City, for respondent.

Before SOMERVILLE, P. J., and DIXON and TURNAGE, JJ.

SOMERVILLE, Presiding Judge.

On this appeal from conviction and imposition of a two year sentence for possession of Lysergic Acid Diethylamide (L.S.D.), a Schedule I controlled substance, defendant claims error (1) in admitting the L.S.D. in evidence because it was obtained by a constitutionally impermissible warrantless search, and (2) in giving Instruction No. 5, the state's verdict director, because it was unsupported by any evidence that defendant had "actual or constructive possession" of the L.S.D. or that defendant "was aware of the character" of the L.S.D. and "intentionally and knowingly had it in his possession."

■ The facts upon which defendant's first point turns are gleaned primarily from evidence adduced at a pre-trial hearing held on a motion to suppress filed by defendant. No detail will be spared in setting this evidence forth as judicial determination of constitutionally proscribed "unreasonable searches and seizures" necessarily turns on the "concrete factual context of the individual case". *Sibron v. State of New York*, 392 U.S. 40, 88 S.Ct. 1889, 1901, 20 L.Ed. 917 (1968).

On the night of July 4, 1975, at approximately 11:55 P.M., Officer Brooks, age 24 and a member of the Warrensburg, Missouri, Police Department, was on routine patrol within the city limits in a marked patrol car. He was alone, in uniform and carrying a handgun in a hip holster. During the course of his patrol he turned off Holden Street onto West Culton Street, a one-way street carrying westbound traffic. He then proceeded west on West Culton Street at a speed of three to five miles per hour. The headlights of his patrol car were on low beam. As he was cruising west on West Culton Street he observed defendant standing in the street alongside a green Chevrolet van which was parked on the south side of West Culton Street, headed west, in the fourth parking space west of Holden Street, and across from the "Abode". More particularly, the right front door of the van was open at a 45° angle and defendant was standing in the street, facing toward the southwest, with his body positioned between the right front door of the van and the right front entranceway to the van. The only artificial light in the area consist-

ed of a streetlight "to the west of the van". When Officer Brooks reached a point approximately twenty feet east of where defendant was standing he observed that defendant had both hands above his head and appeared to be rolling a cigarette. Officer Brooks kept defendant in view as he drove past, and then stopped his patrol car at a point approximately ten feet west of where defendant was standing. At that point, according to Officer Brooks, defendant glanced at the patrol car, then looked back to what he was doing, then glanced back at the patrol car, and then brought the cigarette he was rolling down and out of view. This prompted Officer Brooks to back the patrol car up and bring it to a stop opposite where defendant was standing. The windows of the patrol car were down at the time, and Officer Brooks, after the patrol car was brought to a stop, asked defendant what he was doing. Hearing no response to his inquiry, Officer Brooks got out of his patrol car and approached to within two or three feet of defendant. While in that position, Officer Brooks again asked defendant what he was doing. Defendant's response was an "unintelligible" mumble. Simultaneously, Officer Brooks observed defendant move and place his right foot over a "handrolled" cigarette which was lying in the street and with his left foot kick at a "canvas-like" green bag which was lying in the street and partially beneath the right side of the van. Defendant kicked at the "canvas-like" green bag three or four times in succession and moved the "canvas-like" green bag some six inches to one foot further under the van. Officer Brooks then moved to within a foot or two of defendant, at which time he was able to see inside the van. From this latter vantage point, Officer Brooks observed a crumpled cigarette paper, a package of cigarette papers, and a clear, plastic "baggie" containing a "green leafy substance" which he "believed" to be marijuana lying on the right front seat of the van. Officer Brooks then placed defendant under arrest for possession of marijuana, took possession of the cigarette papers and clear plastic "baggie" which he had observed lying on the right front seat

of the van, and picked up the hand rolled cigarette from where it was lying in the street. After doing so, the van was moved to a "bank parking lot" which was located on the south side of West Culton Street and adjacent to where the van had been parked. After the van was moved, Officer Brooks picked up the "canvas-like" green bag, which was open at one end, from where it was lying in the street and then radioed for "back-up assistance". Two patrol cars responded to Officer Brooks' request for assistance. The driver of one of the patrol cars testified that he responded to Officer Brooks' request for "back-up assistance" at approximately 12:00 midnight. After the backup assistance arrived, defendant was given a "*Miranda* warning", the contents of the "canvas-like" bag were removed and observed, a "preliminary search" of "defendant's person" was conducted, and a "preliminary search" of the van was conducted. This all occurred at the situs of defendant's arrest. Defendant and the van were then removed to police headquarters. The controlled substance (confirmed by laboratory tests as being L.S.D.) which defendant was charged and convicted of possessing was among the contents of the "canvas-like" green bag. Prior to observing defendant standing alongside the green Chevrolet van, Officer Brooks "had no reports" of "any illegal activity of any kind" in the vicinity. Defendant was a total stranger to Officer Brooks and the green Chevrolet van was an "unfamiliar" vehicle. During the entire span of events which unfolded, Officer Brooks never sensed or felt any cause to be fearful of defendant. Defendant had long blond hair, a mustache, and was wearing wire rimmed gold glasses. A dispassionate view of this evidence leaves no doubt that Fourth Amendment issues of an exceedingly subtle nature may well reach fruition on this appeal.

An innovative argument is tendered by defendant in support of his first point, and one which touches upon seldom encountered ramifications of the Fourth Amendment. Defendant *assumes* that a seizure of his person within the context of the Fourth

Amendment occurred when the police officer initially stopped his patrol car and first placed defendant under observation. After making this broad, sweeping assumption, he argues that seizure of his person was constitutionally unreasonable as measured by the standards articulated in *Terry v. State of Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and all evidence subsequently obtained by the police officer was inadmissible as fruits of an unreasonable warrantless seizure of his person.[1] The state, with considerable aplomb, virtually skirts the difficult, underlying issue raised by defendant by arguing that the controversial evidence was admissible under the "plain view" or "incident to lawful arrest" exceptions to the warrant requirements of the Fourth Amendment.

■ The fatal flaw in defendant's argument is the false assumption upon which it rests. If there was no seizure of defendant's person within contemplation of the Fourth Amendment up to and including the moment the police officer observed what he believed to be contraband in plain view, then, as hereinafter demonstrated, defendant's arrest for possession of marijuana was justified and taking possession of the "canvas-like" green bag thereafter and ascertaining its contents may be constitutionally validated as being incident to defendant's lawful arrest. Thus, events leading up to and underlying the moment the police officer observed the clear plastic "baggie" lying on the right front seat of defendant's van become the ultimate focal points of this case. If the police officer's observation of the contraband was had from a lawful vantage point it could be relied upon to provide probable cause for defendant's arrest. "It has long been settled that objects falling in the plain view of an officer *who has a right to be in the position to have that view* are subject to seizure and may be introduced in evidence." (Emphasis added.) *Harris v. United States*, 390 U.S. 234, 88 S.Ct. 992, 993, 19 L.Ed. 1067 (1968).

■ Street encounters between police and citizens of less magnitude than traditional arrests and *Terry* type restraints occupy the twilight zone of Fourth Amendment jurisprudence. Although the majority in *Terry* realistically recognized that "[s]treet encounters between citizens and police officers are incredibly rich in diversity", 88 S.Ct. at 1875, and that all "personal intercourse between policemen and citizens" does not involve " 'seizures' of persons", 88 S.Ct. at 1879, n. 16, restraint was carefully exercised to avoid laying down any definitive guidelines as to police conduct which falls short of seizure of a citizen within the perspective of the Fourth Amendment. The majority in *Terry* did, however, skeletally spell out police conduct short of traditional arrest which constitutes seizure of a citizen cognizable under the Fourth Amendment. As unequivocally stated in *Terry*, "[i]t must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person", 88 S.Ct. at 1877, and no room was left to entertain any doubt that seizure of an individual within the scope of the Fourth Amendment could be effected "by means of physical force or show of authority", 88 S.Ct. at 1879, n. 16. Bearing in mind court-recognized realities surrounding street encounters in general between police and citizens, and reasoning inversely from the absolute principles that herald seizures cognizable under the Fourth Amendment, this court concludes that defendant's person had not been seized in a constitutional sense when the police officer observed the clear plastic "baggie" containing what he believed to be marijuana.

Encounters between police officers and citizens run the gamut from inoffensively conducted police investigations and constitutionally permissible searches and seizures to offensive harassment and constitutionally impermissible searches and seizures. The former is conventionally lauded as "good police work" and the latter is properly con-

---

1. See generally, *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

demned as doing violence to the Fourth Amendment. A hazy line exists between the two when an encounter stops short of a traditional arrest or *Terry* type restraint. On such occasions, practical considerations must not be totally obliterated. Police officers are not scientifically programmed robots. If they were, they could be programmed for constitutional perfection and Fourth Amendment issues would automatically be precluded by scientific precision. However, the duties of police officers on patrol are not performed in controlled scientific atmospheres, but rather in the hurly-burly of the streets. Virtually their only tools in ferreting out and combating crime on many occasions are experience, intuition, and inquisitiveness. If these are taken away, even when constitutionally kept in check, police patrols will become little more than ceremonies and those performing them might just as well enjoy the safety and comfort of the station house.

█ In the instant case a uniformed police officer was on routine patrol in a marked police car a few minutes before midnight when he observed a stranger, who turned out to be the defendant, standing alongside a van in the public street with both hands above his head and apparently engaged in rolling a cigarette. Not being of the Bull Durham generation, and perhaps suspicious of habits pervading the drug culture, the police officer's curiosity was piqued and he stopped and asked defendant what he was doing. Hearing no response he got out of his patrol car, approached defendant on foot, and at closer range again asked him what he was doing. Although defendant was not obliged to respond to the police officer's inquiry, an "unintelligible" mumble was uttered. Simultaneously, the police officer observed defendant place his right foot on a hand rolled cigarette lying on the pavement and with his left foot furtively kick at a "canvas-like" green bag lying on the pavement. The police officer then moved to within a foot or two of defendant at which time he observed through the open door of the van a clear plastic "baggie" containing what he believed to be marijuana lying on the right front seat. In a broad sense, the police officer was in a place where he had a right to be, a public street, when the clear plastic "baggie" containing what he believed was marijuana fell in plain view. In the more narrow sense addressed by defendant, the police officer was also in a place where he had a right to be when he "plainviewed" the contraband. Assuming, arguendo, a lack of articulable facts from which the police officer could reasonably have concluded in light of his experience that criminal activity was afoot up to and including the moment the contraband fell into view, *Terry v. State of Ohio,* supra, 88 S.Ct. at 1884, the conduct of the police officer up to and including the moment he occupied his vantage point nevertheless fell short of either actual or constructive restraint of defendant, i. e. a seizure of defendant, and, concomitantly, was not tantamount to a seizure of defendant within the purview of the Fourth Amendment. However close the encounter may have come to a constitutionally forbidden precipice, no physical, i. e. actual, restraint of defendant occurred, nor was there such a show of authority as to work a constructive restraint. A panoply of reasons auger against characterizing the encounter up to that point as so police dominated as to be equivalent to constructive restraint of defendant by a show of authority: (1) it was a one on one encounter; (2) the question which the police officer posed to defendant was facially innocuous and inoffensive; (3) the police officer at no time drew a weapon or flashed any indicia of authority; (4) objectively, no effort was made to hassle, harass or intimidate defendant, and there is no evidence to suggest or intimate a disguised effort to do so; and (5) laying aside speculation, there is nothing to suggest that defendant reasonably believed that he could not walk away from the scene and refuse to answer the police officer's simple inquiry. Relying upon the *Terry* rubric that all "personal intercourse" between police officers and citizens during street encounters does not rise to "seizures" of Fourth Amendment dimensions, and after juxtaposing the salient facts, concepts

of actual and constructive restraint in the constitutional sense of "seizure", and the inescapable fact that police officers react humanly rather than mechanically to the diverse exigencies that stalk the streets, this court concludes that up to and including the time the contraband fell within plain view of the police officer no unconstitutional intrusion upon defendant's rightful expectation of privacy had occurred. This court is unswayed by broad, sweeping arguments frequently made that every indulgence of inquisitiveness and every response to curiosity by police officers transcend constitutional limitations. Placed in proper perspective, the exclusionary rule [2] serves a double purpose, the deterrence of lawless police conduct, *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 344, 58 L.Ed. 652 (1914), and the "imperative of judicial integrity", *Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 1447, 4 L.Ed.2d 1669 (1960). Neither purpose is offended by this court's conclusion that no actual or constructive seizure of defendant had taken place when the contraband fell within plain view of the police officer. Parenthetically, this court wishes to emphasize that its conclusion should not be construed as minimizing the warrant requirements of the Fourth Amendment and its proscription against unreasonable searches and seizures, as time has demonstrated that the Fourth Amendment is the American citizen's staunchest ally in warding off the evils of totalitarianism. By the same token, this court is not so naive as not to be aware that time has also hinted that there may be nothing left to save if all police conduct is suspect and indiscriminately struck down for nonexistent constitutional reasons.

■ It is well established that probable cause for defendant's arrest existed the moment the clear plastic "baggie" containing what the police officer believed to be marijuana fell into plain view. As the search under scrutiny antedated *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), the police officer, after placing defendant under custodial arrest at the scene for possession of marijuana, was justified under the facts confronting him and the *then* existing law in reasonably believing in good faith that he could rightfully take possession of the "canvas-like" green bag as incident to defendant's arrest, *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), and *United States v. Battle*, 166 U.S.App.D.C. 396, 398-9, 510 F.2d 776, 778-9 (1975), and after reducing it to his possession could delay ascertainment of its contents for a reasonable period of time, *United States v. Edwards*, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974), and *United States v. Battle*, supra. Although the more recent decision of the Supreme Court in *United States v. Chadwick*, supra,[3] might arguably render the aforementioned precedents open to attack, its holding can safely be pretermitted because it has been held that *Chadwick* is not to be applied retroactively. Relying upon *United States v. Peltier*, 422 U.S. 531, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975),[4] which squarely faced the problem of retroactive application of

2. Made applicable to state court proceedings by *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 1692, 6 L.Ed.2d 1081 (1961).

3. 97 S.Ct. at 2485: "Once law enforcement officers have reduced luggage or other personal property not immediately associated with the person of the arrestee to their exclusive control, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest."

4. 95 S.Ct. at 2317: "[I]f the law enforcement officers reasonably believed in good faith that evidence they had seized was admissible at trial, the 'imperative of judicial integrity' is not offended by the introduction into evidence of that material even if decisions subsequent to the search or seizure have broadened the exclusionary rule to encompass evidence seized in that manner."

95 S.Ct. at 2320: "If the purpose of the exclusionary rule is to deter unlawful police conduct, then evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment."

 

the exclusionary rule, the following cases expressly hold that *Chadwick* is not to be applied retroactively: *United States v. Berry*, 571 F.2d 2 (7th Cir. 1978); *United States v. Reda*, 563 F.2d 510 (2nd Cir. 1977), *cert. denied* 435 U.S. 973, 98 S.Ct. 1617, 56 L.Ed.2d 65 (1978); and *United States v. Montgomery*, 558 F.2d 311 (5th Cir. 1977). The trial court, contrary to the position taken by defendant in his first point, properly admitted the L.S.D. in evidence.

■ Defendant's second and final point is a broadside attack upon the sufficiency of the evidence to support the giving of Instruction No. 5, the state's verdict director. Under the prevailing case law of this state, which Instruction No. 5 properly reflected, it was incumbent upon the state to prove beyond a reasonable doubt that defendant "had knowledge of the nature and presence of the substance and that he had some conscious control [of it] either actual or constructive." *State v. Stewart*, 542 S.W.2d 533, 538 (Mo.App.1976), and cases therein cited. Actual possession is not demanded, and constructive possession will suffice. *State v. Worley*, 375 S.W.2d 44, 47 (Mo.1964); *State v. Mulkey*, 523 S.W.2d 145, 148 (Mo.App.1975); and *State v. Davis*, 515 S.W.2d 773, 777 (Mo.App.1974). Possession may be proven circumstantially. *State v. Davis*, supra, at 777; *State v. Mulkey*, at 148; and *State v. Stewart*, at 538. Likewise, knowledge of the nature and presence of an offending substance may be circumstantially proven. *State v. Scarlett*, 486 S.W.2d 409 (Mo.1972); *State v. Lewis*, 526 S.W.2d 49 (Mo.App.1975); and *State v. Hedrick*, 534 S.W.2d 578, 585 (Mo.App.1976).

■ When the above legal principles are wedded to certain evidence presented to the jury in this case, the untenability of defendant's final point becomes obvious. Certain mannerisms and conduct of defendant—the "double-take" he did when he first observed the police officer and his attempt to secrete the "canvas-like" green bag by kicking it under the van—permitted the jury to reasonably infer that defendant had both possession of the "canvas-like" green bag and knowledge of the illicit nature of its contents. In summation, sufficient evidence was produced by the state to make both possession and knowledge questions of fact for the jury.

Judgment affirmed.

All concur.